Martin W. Schiffmiller  (MS 7939)
KIRSCHSTEIN, ISRAEL,
SCHIFFMILLER & PIERONI, P.C.
Attorneys for Plaintiff
425 Fifth Avenue - Fifth Floor
New York, New York 10016-2223
Tel.: (212) 697-3750
Fax: (212) 949-1690
E-mail: mws@kirschsteinlaw.com

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

BRUNI GLASS S.p.A.,
(formerly VETRERIE BRUNI S.p.A.),

                      Plaintiff

          v.

DRINKS AMERICAS, INC.

                 Defendant.

Civil Action No.
09 CV 929 (LAK)

ECF CASE

-----------------------------------------------------------X

## COMPLAINT

Plaintiff, complaining of Defendant, alleges as follows through its undersigned attorneys:

### Jurisdiction and Venue

1.  This action is for recovery on an account stated and for breach of contract.  The Court has jurisdiction of this action under 28 U.S.C. Section 1332(a) inasmuch as complete diversity exists among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  Venue is proper in this judicial district inasmuch as (a) Defendant has consented by

contractual agreement to this judicial district as proper venue for any disputes with Plaintiff arising out of said agreement, and (b) upon information and belief, Defendant has transacted business and engaged in other acts in this judicial district which render its contacts with this district sufficient to subject it to personal jurisdiction herein if this district were a separate state and, thus, are deemed to reside in this district under 28 U.S.C. Section 1391(c).

## The Parties

2. Plaintiff Bruni Glass S.p.A. (formerly known as Vetrerie Bruni S.p.A.) is a corporation organized and existing under the laws of Italy and has its principal office and place of business at Via le Cristoforo Colombo 12/14 20090 Trezzano Sur Naviglio, Italy. Plaintiff is a designer, creator, manufacturer and marketer of high-quality and innovative glass bottles sold empty, e.g., bottles intended to be filled with wines and spirits. Plaintiff's name was changed to "Bruni Glass S.p.A." in January 2009 by change of name document recorded in Italy.

3. Upon information and belief, Defendant Drinks Americas, Inc. is a corporation organized and existing under the laws of the State of Delaware and having its principal office and place of business at 372 Danbury Road, Suite 163, Wilton, CT 06897. Defendant is an importer and seller of wines and spirits.

## The Facts

4. On November 20, 2007, United States Patent No. Des. 555,501 (the "'501 patent"), entitled "BOTTLE" was duly and legally issued to Plaintiff as assignee of the inventor, Roberto Del Bon. Plaintiff has produced and sold bottles having a design/configuration coming within the scope of the '501 patent ("Patented Bottles").

5. From about 2006-2007, Defendant ordered quantities of Patented Bottles from Plaintiff which Plaintiff produced for Defendant. Defendant subsequently had those bottles filled

with vodka in the Netherlands and imported the filled bottles into the United States under the licensed "Trump" brand name. Defendant paid Plaintiff for some of the bottles it ordered.

6.  In early 2007, however, Defendant placed two orders with Plaintiff, each for the production of 250,000 Patented Bottles in the 50 ml size ("mini-bottles"). Copies of order confirmation documents with respect to these orders for a total of 500,000 mini-bottles placed by Defendant with Plaintiff are attached hereto as Exhibits A and B, respectively. Each of these order confirmations was signed and acknowledged by an authorized officer of Defendant. The aggregate prices agreed upon by Plaintiff and Defendant were $180,416.38 for the first order of mini-bottles and $65,542.40 for the second order of mini-bottles, for a total of $245,958.78.

7.  Plaintiff produced all 500,000 mini-bottles at Defendant's express order and invoiced Defendant (and debited Defendant's account) in the amount of the agreed-upon price of $245,958.78. However, as of the close of 2008 Defendant had paid and/or received credits on its account with Plaintiff only in the amount of $180,726.60, leaving an unpaid balance on account of $65,232.18. Plaintiff and/or its counsel repeatedly sent statements to Defendant with regard to this balance on account. In January 2009 Defendant paid Plaintiff $10,000 on account, leaving an outstanding balance of **$55,232.18**. No further payments on this account have been received.

8.  Defendant ceased ordering Patented Bottles from Plaintiff in 2007 and began purchasing from China unauthorized imitations of the Patented Bottles to be filled with vodka and imported into the United States, notwithstanding that Defendant had been advised by Plaintiff that Plaintiff owned exclusive rights in the design of those bottles. The importation of these imitation bottles by Defendant constituted infringement of Plaintiff's '501 patent.

9.  When Plaintiff learned that Defendant was importing infringing imitations of the Patented Bottles, Plaintiff entered into discussions with Defendant for the purpose of arriving at an

arrangement whereby Defendant would take a license under the '501 patent and pay royalties to Defendant with respect to all third-party Patented Bottles previously imported by Defendant and with respect to any future importation by Defendant of such bottles. Consequently, on June 12, 2008 Plaintiff and Defendant entered into a license agreement (the "License Agreement"), a copy of which is attached hereto as Exhibit C.

10.   Pursuant to the License Agreement, Plaintiff (referred to therein as "Bruni") granted to Defendant (referred to therein as "DAI") an exclusive, royalty-bearing license under the '501 patent retroactive to January 1, 2008. In consideration of that license Defendant agreed (a) to provide a written royalty statement at the time the License Agreement was signed with respect to all Patented Bottles purchased by Defendant up to and including December 31, 2007 from manufacturers or suppliers other than Plaintiffs and to pay royalties on all such bottles at the rates set forth in the License Agreement (Section 8 of the License Agreement), and (b) to pay Plaintiff a per unit royalty on all Patented Bottles purchased by Defendant from third-party sources, but in any event no less than $150,000 per year in guaranteed royalties during the term of the License Agreement commencing with calendar year 2008 (Sections 4 and 5). The completion of the minimum payment of $150,000 in royalties for the 2008 calendar year was due under the terms of the License Agreement no later than January 30, 2009 (Section 6(d)).

11.   Notwithstanding the express provisions of the License Agreement, Defendant has neither provided Plaintiff any statement with regard to its pre-2008 purchases of unauthorized Patented Bottles nor paid Plaintiff any royalties with respect to pre-2008 purchases.

12.   Notwithstanding the express provisions of the License Agreement, Defendant has not paid Plaintiff any portion of the $150,000 guaranteed minimum royalties it owes Plaintiff for calendar year 2008.

## FIRST CLAIM: ACCOUNT STATED

13.  Plaintiff repeats and realleges the allegations set forth above in paragraphs 1-12 as if they were more fully set forth herein.

14.  Plaintiff and/or its counsel have repeatedly provided written statements to Defendant with respect to the balance due Plaintiff for the orders of mini-bottles placed by Defendant and confirmed by Plaintiff in March 2007, and subsequently manufactured by Plaintiff at Defendant's express order. Defendant has not disputed the accuracy of Plaintiff's statements of account, but still has an unpaid balance on its account in the amount of $55,232.18.

## SECOND CLAIM: BREACH OF CONTRACT

15 .  Plaintiff repeats and realleges the allegations set forth above in paragraphs 1-12 as if they were more fully set forth herein.

16.  Plaintiff is in breach of the License Agreement as a result of (a) its failure to provide Plaintiff any statement with respect to the quantities of Patented Bottles it purchased from sources other than Plaintiff through December 31, 2007, (b) its failure to pay Plaintiff the royalties due with respect to said purchases of bottles, and (c) its failure to pay Plaintiff $150,000 in guaranteed minimum royalties due for calendar year 2008.

WHEREFORE, Plaintiff prays that this Court:

a) award Plaintiff judgment on its First Claim against Defendant in the amount of $55,232.18 plus interest at the maximum rate allowed by law;

b) award Plaintiff judgment on its Second Claim against Defendant in the amount of $150,000.00  plus interest at the maximum rate allowed by law;

c) order Defendant to provide to Plaintiff a written royalty statement with respect to all Patented Bottles purchased by Defendant up to and including December 31, 2007 from manufacturers or suppliers other than Plaintiff, and to pay all royalties due on such purchases at the rates set forth in the License Agreement plus interest at the maximum rate allowed by law; and

d) award Plaintiff such other and further relief as the Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

KIRSCHSTEIN, ISRAEL,
SCHIFFMILLER & PIERONI, P.C.
Attorneys for Plaintiff

Dated:  New York, New York
February 3, 2009

By _Martin W. Schiffmiller_
    Martin W. Schiffmiller
    MS 7939

# EXHIBIT A

**Vetrerie Bruni S.p.A.**
Viale C. Colombo, 12/14 - 20090 Trezzano s/N (MI) Italia
Tel. ++39/02/48.436.1 - Telefax ++39/02/48.436.51 – E.Mail info@vetreriebruni.com
Codice Fiscale e Partita IVA 01746490158

**vetrerie bruni**

| ORDER CONFIRMATION N°: OC07-146 | Place & Date : Trezzano s/N, March 14, 2007 | Cod.: 73232   Fax : +1 203  7627000 |
|---|---|---|
| Your Reference: | Our Reference: | Customer:  DRINKS AMERICAS |
| Shipment Through: FULL TRUCK LOADS | Delivery: FOB HOLLAND ON FULL TRUCK LOADS | 372 DANBURY ROAD SUITE 163 WILTON, CONNECTICUT 06897 |
| Payment Terms: 30% DOWN PAYMENT WITHIN MARCH 16TH PLUS IRREVOCABLE LETTER OF CREDIT TO FOLLOW | | Shipping Address: **DISTILLEERDERIJ ONDER DE BOOMPJES** A.H. WANDERS B.V. SOERWEG 7, 3088 GR ROTTERDAM |

Product Description: BOT. MILLENIA 50 ML P 18 TRUMP $ *

| Quantity: 250,000 | USD / 1.000 units: $ ~~399.00/1000 US~~ | | Offer Price: March 16th, 2007 | Price Expires: December 31st, 2007 |
|---|---|---|---|---|
| Terms of Delivery: BY MID MAY. | $ 280.00/1000 US ~~$ 284.~~ | 23rd | | |

Packaging – Handling Charges: BULK WITH CARTON DIVIDERS

Notes: PRICE INCLUDES GLASS ~~AND PRESSURE SENSITIVE LABELS TO BE SUPPLIED SEPARATELY. WITHOUT APPLICATION.~~

VETRERIE BRUNI SPA HAS TO RECEIVE EVIDENCE THAT THE ABOVE BOTTLES HAVE BEEN FINALLY SHIPPED TO THE USA FROM THE FILLER (SEE SHIPPING ADDRESS) LATEST 3 MONTHS AFTER THE FILLER HAS RECEIVED THE BOTTLES OTHERWISE WILL BE FORCED TO INVOICE 20% FOR VAT PURPOSES.

GENERAL TERMS AND CONDITIONS OF SALE:  - ART. 1) If more than 2% of the goods ordered is defective or non-conforming, the portion exceeding 2% will be replaced or picked up with refund of the respective price, at the discretion of the Supplier, without prejudice to the validity of the Order Confirmation. - ART. 2) The Supplier shall not be liable for direct or indirect damage resulting to any party in the eventualities envisaged under Article 1, including in the case where the deficiencies involve the entire lot, since the Buyer is also responsible for accurately inspecting the merchandise before filling, packaging and marketing. - ART. 3) If not especially indicated in the specifications, the characteristics of the goods sold (capacity, size, colour, etc) do not represent absolute values, but can fall within the normal usage tolerance specification. - ART. 4) After 8 days from receipt of the goods the shipment is considered accepted unless the Buyer has notified the Supplier by registered letter, or equivalent, of eventual non conformities or alleged claims. - ART. 5) The Supplier reserves the right to refuse or discontinue the supplies if it believes that the brands, names, writing, designs, models, etc are counterfeit or subject to actions of unfair competition etc., not withstanding the fact that the Buyer releases the Supplier from any responsibility on this issue and holds the Supplier harmless from any action or intention by third parties. - ART. 6) Payment: unless otherwise agreed, all payments for goods shall be made at Seller's place of business. A late payment charge will be assessed on any obligation not paid within the time set forth above at a rate of 1 ¼ % per month; provided, however that such late payment charge shall not be assessed at a rate which exceeds maximum permitted by applicable law. The supplier will have full right to suspend the deliveries, until full payment has not been made. - ART. 7) Unless otherwise agreed upon, the prices are subject to change according to increases in the costs of raw materials, personnel, etc. at any time during the supply when such increases, on the whole, exceed 5% of the original cost. The Buyer agrees to pay the portion in excess of the first 5% of the cost increases.    - ART. 8) For technical production reasons, the order must be considered normally executed even if the quantities delivered are 10% higher or lower than the quantities ordered. The date of delivery is not peremptory for the Supplier, such date is considered approximate. - ART. 9) The goods must be picked up by the Buyer at the agreed dates. In the case of non-compliance, the Supplier will have the right to invoice the goods in deposit. The Supplier shall not be liable for any alterations of the white glass (alkaline release) or for losses due to breakage, shrinkage, handling, etc. in any goods invoiced and held in consignment at the Supplier's warehouse, sixty days after the date of invoice. After this date, the Supplier will charge the Buyer € 4.00 for every month per stackable pallet to cover warehousing costs and charges. - ART. 10) Events of force majeure release the Supplier from the undertaken commitments. Cases of force majeure can include but are not limited to mobilization of the armed forces, public disaster, fires, strikes, lack of supply of fuel and raw materials, lack of operation of the furnaces and equipment, and any other factor beyond the control of the Supplier which can cause the suspension or slowing of order processing. - ART. 11) The Supplier does not recognize guarantees or commitments not specifically cited on this order and expressly accepted by the Parties. - ART. 12) For any dispute which could arise, including the action in warranty, the Parties recognize the sole and exclusive jurisdiction of the Court of Milan - Italy.

VETRERIE BRUNI S.p.A.

_3/22/06_
date

SEAL AND SIGNATURE OF THE CUSTOMER

To the effects of Articles 1331/1332 of the Civil Code, we declare to have carefully read the aforementioned General Terms and Conditions of Sale and approve them. Specifically, we approve the following provisions: 1 - 2 - 3 - 5 - 6 - 7 - 8 - 9 - 10 - 12.

SEAL AND SIGNATURE OF THE CUSTOMER

2

# EXHIBIT B

Vetrerie Bruni S.p.A.
Case 1:08-cv-00929-LAK Document 1 Filed 02/03/08 Page 10 of 22 Trezzano s/N (MI) Ital
Tel. ++39/02/48.436.1 - Telefax ++39/02/48.436.51 - E.Mail info@vetreriebruni.co
Codice Fiscale e Partita IVA 01746490151

| ORDER CONFIRMATION N° : OC07-144 | Place & Date : Trezzano s/N, March 14, 2007 | Cod.: 73232   Fax : +1 203  7627000 |
|---|---|---|
| Your Reference: | Our Reference: | Customer:  DRINKS AMERICAS |
| Shipment Through: FULL TRUCK LOADS | Delivery: FOB HOLLAND ON FULL TRUCK LOADS | 372 DANBURY ROAD SUITE 163 WILTON, CONNECTICUT 06897 |

Customer:  **DRINKS AMERICAS**

372 DANBURY ROAD
SUITE 163
WILTON, CONNECTICUT 06897

Shipping Address:
**DISTILLEERDERIJ ONDER DE BOOMPJES**

A.H. WANDERS B.V.
SOERWEG 7, 3088 GR ROTTERDAM

Payment Terms: 30% DOWN PAYMENT WITHIN MARCH 16TH, 2007, PLUS IRREVOCABLE LETTER OF CREDIT TO FOLLOW

Product Description: BOT. MILLENIA 50 ML P 18 TRUMP $ *

| Quantity: 250,000 | USD / 1.000 units: $ 714.00/1000 US | Offer Price: March 16th, 2007 | Price Expires: December 31st, 2007 |
|---|---|---|---|

Terms of Delivery:

*BY END OF MAY*

Packaging – Handling Charges: BULK WITH CARTON DIVIDERS

Notes: PRICE INCLUDES GLASS, PRESSURE SENSITIVE LABELS AND APPLICATION AS PER LAST PRODUCTION.

VETRERIE BRUNI SPA HAS TO RECEIVE EVIDENCE THAT THE ABOVE BOTTLES HAVE BEEN FINALLY SHIPPED TO THE USA FROM THE FILLER (SEE SHIPPING ADDRESS) LATEST 3 MONTHS AFTER THE FILLER HAS RECEIVED THE BOTTLES OTHERWISE WILL BE FORCED TO INVOICE 20% FOR VAT PURPOSES.

GENERAL TERMS AND CONDITIONS OF SALE: - ART. 1) If more than 2% of the goods ordered is defective or non-conforming, the portion exceeding 2% will be replaced or picked up with refund of the respective price, at the discretion of the Supplier, without prejudice to the validity of the Order Confirmation. - ART. 2) The Supplier shall not be liable for direct or indirect damage resulting to any party in the eventualities envisaged under Article 1, including in the case where the deficiencies involve the entire lot, since the Buyer is also responsible for accurately inspecting the merchandise before filling, packaging and marketing. - ART. 3) If not especially indicated in the specifications, the characteristics of the goods sold (capacity, size, colour, etc) do not represent absolute values, but can fall within the normal usage tolerance specification. - ART. 4) After 8 days from receipt of the goods the shipment is considered accepted unless the Buyer has notified the Supplier by registered letter, or equivalent, of eventual non conformities or alleged claims. - ART. 5) The Supplier reserves the right to refuse or discontinue the supplies if it believes that the brands, names, writing, designs, models, etc are counterfeit or subject to actions of unfair competition etc., not withstanding the fact that the Buyer releases the Supplier from any responsibility on this issue and holds the Supplier harmless from any action or intention by third parties. - ART. 6) Payment: unless otherwise agreed, all payments for goods shall be made at Seller's place of business. A late payment charge will be assessed on any obligation not paid within the time set forth above at a rate of 1 ½ % per month; provided, however that such late payment charge shall not be assessed at a rate which exceeds maximum permitted by applicable law. The supplier will have full right to suspend the deliveries, until full payment has not been made. - ART. 7) Unless otherwise agreed upon, the prices are subject to change according to increases in the costs of raw materials, personnel, etc. at any time during the supply when such increases, on the whole, exceed 5% of the original cost. The Buyer agrees to pay the portion in excess of the first 5% of the cost increases. - ART. 8) For technical production reasons, the order must be considered normally executed even if the quantities delivered are 10% higher or lower than the quantities ordered. The date of delivery is not peremptory for the Supplier, such date is considered approximate. - ART. 9) The goods must be picked up by the Buyer at the agreed dates. In the case of non-compliance, the Supplier will have the right to invoice the goods in deposit. The Supplier shall not be liable for any alterations of the white glass (alkaline release) or for losses due to breakage, shrinkage, handling, etc. in any goods invoiced and held in consignment at the Supplier's warehouse, sixty days after the date of invoice. After this date, the Supplier will charge the Buyer € 4.00 for every month per stackable pallet to cover warehousing costs and charges. - ART. 10) Events of *force majeure* release the Supplier from the undertaken commitments. Cases of *force majeure* can include but are not limited to mobilization of the armed forces, public disaster, fires, strikes, lack of supply of fuel and raw materials, lack of operation of the furnaces and equipment, and any other factor beyond the control of the Supplier which can cause the suspension or slowing of order processing. - ART. 11) The Supplier does not recognize guarantees or commitments not specifically cited on this order and expressly accepted by the Parties. - ART. 12) For any dispute which could arise, including the action in warranty, the Parties recognize the sole and exclusive jurisdiction of the Court of Milan - Italy.

**VETRERIE BRUNI S.p.A.**

3/22/06
date

SEAL AND SIGNATURE OF THE CUSTOMER

To the effects of Articles 1331/1332 of the Civil Code, we declare to have carefully read the aforementioned General Terms and Conditions of Sale and approve them. Specifically, we approve the following provisions: 1 - 2 - 3 - 5 - 6 - 7 - 8 - 9 - 10 - 12.

SEAL AND SIGNATURE OF THE CUSTOMER

# EXHIBIT C

## LICENSE AGREEMENT

WHEREAS, **Vetrerie Bruni S.p.A.** ("Bruni") is a corporation organized under the laws of Italy and having its principal office and place of business at Via le Cristoforo Colombo 12/14 20090 Trezzano S/N. (MI), Italy; and

WHEREAS, **Drinks Americas, Inc.** ("DAI") is a corporation organized and existing under the laws of the State of Delaware and having its principal office and place of business at 372 Danbury Road, Suite 163, Wilton, CT 06897; and

WHEREAS, Bruni is the owner of all right, title and interest in and to a novel and original design or configuration of a bottle for wine or spirits (hereinafter, the "Design"), depicted in the drawings attached hereto collectively as Exhibit A; and

WHEREAS, Bruni has obtained United States Design Patent No. D555,501 (the "Patent") in connection with certain aspects of the Design and has further filed United States Design Patent Application No. 29/269,350 (the "Application") in connection with the Design, and the Application is currently pending; and

WHEREAS, DAI initially purchased glass bottles for its Trump Super Premium Vodka embodying the Design (the "Bottles") from Bruni for importation into the United States, but has since notified Bruni that to continue to utilize the Bottles, they must be sourced and produced on a more cost-effective basis, therefore requiring the parties to enter into a worldwide , exclusive license agreement for the Design and the production of the Bottles; and

WHEREAS, the parties wish to enter into a worldwide, exclusive license agreement that will permit DAI to continue purchasing and/or sourcing Bottles embodying the Design from any source it chooses while providing suitable remuneration to Bruni for past and future use of the Design for the Bottles.

NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties hereto agree as follows:

1.  **Definitions**

     (a)  As used herein, "Licensed Products" shall mean all bottles of any size, filled or unfilled, embodying (or substantially embodying) the Design.

     (b)  As used herein, "Royalties" refers to Guaranteed Minimum Royalties (as described in Section 4 below) and Earned Royalties (as described in Section 5 below).

     (c)  All monetary amounts mentioned herein are in U.S. dollars.

     (d)  The singular and plural forms of any terms set off by quotation marks in this Agreement shall have the same meaning.

2. **License Grant**

(a) Subject to the terms and conditions herein Bruni hereby grants to DAI (and its subsidiaries), and DAI hereby accepts from Bruni, an exclusive, royalty-bearing license under its rights in the Design, the Patent, the Application, and any patent(s) that may issue on the Application or any continuations, continuations-in-part or divisions thereof, without any right to sublicense, to make and have made Licensed Products for importation, sale and distribution by DAI worldwide. This license shall be retroactive to January 1, 2008 and shall be subject to the assurances and representations of rights and ownership that have been made by Bruni and extended to Drinks Americas in all prior agreements.

3. **Term; Termination**

(a) This agreement shall be deemed to have commenced on January 1, 2008 and shall remain in force, provided it is not earlier terminated, until the expiration of the last patent to issue on the Application or any continuations, continuations-in-part or divisions thereof.

(b) DAI shall have the right to terminate this Agreement only upon (i) the material failure of any representations or warranties made by Bruni under this agreement, or (ii) at least one year's advance notice in writing to Bruni that DAI wishes to terminate this Agreement.

(c) DAI shall have the right to terminate this Agreement if DAI's license/distributorship agreement with The Trump Organization, Trump Marks LLC and/or Donald Trump (the "Trump Agreement") is voided or canceled for any reason. Such voiding or cancellation of the Trump Agreement shall not, however, relieve DAI of its obligations (i) to pay Earned Royalties to Bruni pursuant to Section 5 on all Licensed Products purchased by DAI, or which are invoiced to DAI, to DAI affiliates or to DAI fillers, prior to or after termination of this Agreement, and (ii) to make a "Shortfall Payment" to Bruni, if applicable under the terms of Section 6(d), with the Guaranteed Minimum Royalties under Section 4 being pro rated in accordance with that portion of the calendar year which elapsed prior to termination of this Agreement.

(d) In the event of any breach of this Agreement by DAI, Bruni shall have the right at its sole option to terminate this Agreement upon written notice to DAI, provided that DAI fails to cure such breach within(90) days after receipt of notice of breach from Bruni.

(e) Upon expiration of this Agreement, or upon earlier termination under subsections (a),(b) or (c) above, DAI shall immediately cease producing and purchasing Licensed Products, but shall have the right to use up all paid inventory of Licensed Products in its possession for a period of no longer than six (6) months from the date of termination, provided that DAI complies fully with the requirements of Sections 5 and 6 below regarding statements and royalty payments with respect to said paid inventory.

4. **Guaranteed Minimum Royalties**

In consideration of the license granted herein DAI shall pay Bruni $150,000.00 as Guaranteed Minimum Royalties during each calendar year of the term of this Agreement, commencing with the year 2008, without regard to the quantity of Licensed Products purchased,




imported or sold by DAI during said year.

5.   **Earned Royalties**

DAI shall further pay Bruni Earned Royalties on Licensed Products equal to

(a)   $ ____ per unit of 50ml bottles (the royalty to be paid per unit of the 50 ml bottle shall be 18% of the total cost of the decorated bottle delivered in the Netherlands);

(b)   $ 0.682 per unit of 750ml bottles;

(c)   $ 0.882 per unit of 1000ml bottles; and

(d)   $ 1.980 per unit of 1500ml bottles,

for all Licensed Products DAI purchases or which are invoiced to DAI, to DAI affiliates or to DAI fillers; provided, however, that Guaranteed Minimum Royalties actually paid by DAI to Bruni with respect to any period of this Agreement shall be deducted from Earned Royalties accrued and owing for that period. Notwithstanding the foregoing, no royalties shall be due or payable on any purchases of Licensed Products made by DAI from Bruni. If DAI chooses to purchase such products from Bruni, it shall pay Bruni's regular European prices therefor.

6.   **Quarterly Payments and Statements**

(a)   Earned Royalties shall be payable ninety (90) days from the date of shipment of Licensed Products from the plant where they are produced to DAI (or its subsidiaries, affiliates or fillers), and Bruni shall at all times be provided with the customs documentation and the production accounting in order to reconcile the accuracy of Earned Royalty payments.

(b)   Within thirty (30) days after the end of each calendar quarter during the term of this Agreement, DAI will render to Bruni a written royalty statement setting forth (i) the number of units of each size of Licensed Products shipped to DAI or to DAI affiliates or fillers during the period covered by the statement; (ii) the name and address of the manufacturer or supplier of said Licensed Products; (iii) the name and address of the filler of said Licensed Products; (iv) the country to which the filled bottles were or will be shipped; (v) the dates of shipment of said Licensed Products to DAI; and (vi) the Earned Royalties owing thereon; and

(c)   Concurrently with the rendering of each quarterly statement DAI will pay Bruni all Earned Royalties that accrued and became payable in the preceding quarter.

(d)   If at the conclusion of any calendar year of this Agreement DAI has paid Bruni less than $150,000 in Earned Royalties in the aggregate for that year, DAI will pay Bruni a sum (the "Shortfall Payment") equal to the difference between the actual Earned Royalties paid in such year, and $150,000. Said Shortfall Payment shall be made to Bruni together with the payment of the Earned Royalties due for the fourth quarter of the year. Upon any such payment, the license agreement shall be deemed in full force and effect.

-3-

(e) If during any year of the license agreement DAI has paid Bruni a total of $400,000 in Earned Royalties, Bruni shall issue a credit to DAI for $20,000 after DAI makes its final payment of Earned Royalties for the year. That credit may be applied against any future payment of Royalties due to Bruni. For each additional $200,000 in Earned Royalties above $400,000 paid by DAI for any year, Bruni will issue a credit to DAI against Future Royalties of an additional $10,000.

## 7.  Option to Purchase

Provided that DAI is in full compliance with all terms of this Agreement, DAI may propose to Bruni at any time after January 1, 2009 that DAI purchase all of Bruni's rights in the Design, including, but not limited to, the Patent and the Application. Thereupon, Bruni will enter into negotiations with DAI to reach a commercially reasonable price for said rights, but Bruni shall not be obligated to sell its rights to DAI unless and until the parties agree on such a price. Bruni will not offer to sell its said rights to any party other than DAI until DAI has first been given the option to purchase and negotiations with DAI to reach a purchase price and/or payment terms have come to an unsatisfactory conclusion.

## 8.  Initial Royalty Payment and Statement

At the time DAI signs this Agreement DAI shall (i) submit to Bruni a written royalty statement, in the form provided in Section 6(a) above, with respect to all Licensed Products purchased by DAI up to and including December 31, 2007 from manufacturers or suppliers other than Bruni, and (ii) pay Bruni all Earned Royalties reflected on that statement.

## 9.  Audits of Records

DAI shall keep at its offices or other premises accurate and complete books and records as they relate to its purchases, importations and sales of Licensed Products, or to purchases, sales or importations of Licensed Products by DAI's affiliates or fillers, until at least two (2) years from the termination or expiration of this Agreement. On reasonable notice and during reasonable business hours, Bruni's duly authorized representatives and agents shall have the right to examine said books and records and to make copies and summaries of such books and records as they apply to the Licensed Products and to this Agreement. If any deficiency in Royalties paid to Bruni for any period under audit ("Audit Deficiency") is discovered, DAI shall promptly pay such Audit Deficiency to Bruni plus interest accruing from the date said unpaid Royalties were due at the rate of 1.5% per month or the highest rate then allowed by applicable law, whichever is higher. If any Audit Deficiency is in excess of three percent (3%) of Royalties paid during any quarterly period, DAI shall pay the full costs of the audit.

## 10. Required Notification to Bottle Producers

DAI must provide written notification to every manufacturer it uses to produce Licensed Products for DAI, its subsidiaries or its fillers during the term of this Agreement that said Licensed Products are being produced for DAI under license from Bruni and that said manufacturer may not produce Licensed Products on behalf of anyone other than DAI, its

-4-

subsidiaries or its fillers. A copy of each such written notification shall be transmitted to Bruni at the same time it is transmitted to a manufacturer.

## 11. Bruni's Representations and Warranties

Bruni represents and warrants that it is owner of the Design, the Patent and the Application and that it has the right and authority to convey all rights which are purported to be conveyed through this Agreement.

## 12. Indemnifications

(a)  Bruni agrees to indemnify and hold harmless DAI from and against all claims, damages (but not consequential damages), liabilities, suits and expenses, including reasonable attorneys' fees, arising out of DAI's use of the Design in connection with Licensed Products as authorized hereunder, provided that DAI gives Bruni prompt notice of all claims or suits relating to such use and Bruni has the right to defend and/or settle any such claims or suits in Bruni's sole and absolute discretion.  Bruni shall control, at its sole expense and in its sole and absolute discretion, all infringement litigation brought by or against third parties involving or affecting the Design or the Application.  Notwithstanding the foregoing, Bruni's indemnification liability hereunder shall in no event be greater than the aggregate amount of Royalties paid by DAI to Bruni under this Agreement up to the date of indemnification.

(b)   DAI agrees to indemnify and hold harmless Bruni from and against all claims, damages (but not consequential damages), liabilities, suits and expenses, including reasonable attorneys' fees, arising out of or in connection with the Licensed Products or their manufacture, packaging, distribution, promotion, sale or exploitation (except with respect to those matters against which Bruni has agreed to indemnify DAI above), including, but not limited to, (i) any defect in the Licensed Products or (ii) personal injury to any third party by the use of the Licensed Products.  Bruni shall have the right to defend any such action or proceeding with counsel of its choice at DAI's cost and expense.  DAI shall maintain appropriate product liability insurance with such limits as would be reasonable given the volume of its sales of licensed products.

## 13. Notice

Any notice required or permitted hereunder, except as otherwise provided in this Agreement, shall be in writing and sent by overnight courier or e-mail transmission to the addresses set forth below or such other address of which notice is so given:

If to Bruni:
Vetrerie Bruni S.p.A.
Via  le  Cristoforo  Colombo  12/14  20090
Trezzano S/N. (MI)
Italy
Attn.:  Mr. Gino Del Bon
E-mail: gino.delbon@vetreriebruni.com

If to DAI:
Drinks Americas, Inc.
372 Danbury Road
Wilton, CT 06897
U.S.A.
Attn.:  Mr. Patrick Kenny
E-mail: jpkenny@drinksamericas.com



### 14.  Assignment and Sublicense

(a)  Bruni may assign this Agreement, the Design, the Application, any patent(s) to issue on the Application, and any related rights to any third party at its sole option, provided said third party agrees to preserve DAI's exclusive license rights thereunder and otherwise abide by the terms of this Agreement.

(b)  DAI may assign this Agreement and its rights and obligations thereunder to any bona fide purchaser of DAI, a controlling interest in DAI, all the assets of DAI, or all the assets of DAI pertinent to the Trump brand of products, provided that DAI give Bruni sixty (60) days advance notice in writing of any proposed assignment and Bruni does not raise a commercially reasonable objection thereto within thirty (30) days after receiving such notice from DAI.  Bruni will not unreasonably withhold approval for such a transfer or assignment of rights in any bona fide purchase.

### 15.  Venue and Choice of Law

Any litigation or lawsuit instituted by any party with respect to this Agreement shall be brought in the federal or state courts in New York, New York and the governing law of this Agreement with respect to such litigation or lawsuit shall be the laws of the state of New York, regardless of the choice of law or conflict of law provisions thereof.

### 16.  Severability

Any provision of this Agreement which is found to be invalid or unenforceable by a court of competent jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability shall not invalidate or render unenforceable such provisions in any other jurisdiction or any other provision of this Agreement.

### 17.  Entire Agreement

The terms and conditions contained in this Agreement constitute the entire understanding between the parties hereto with respect to the subject matter hereof and supersede all previous agreements and understandings between the parties, whether oral or written, with respect to the subject matter hereof.  No alteration, amendment, waiver, cancellation or any other change in any term or condition of this Agreement shall be valid or binding on a party unless the same shall have been mutually assented to in writing and signed by duly authorized representatives of both parties.

### 18.  Effective Date; Authorization

This Agreement shall be effective as of the later of the dates of execution set forth below. The individuals signing below on behalf of the parties are authorized by the respective parties to execute this Agreement on their behalf.

-6-

 

**19.** **Waiver of any Claims Against The Trump Organization or its Affiliates**

Bruni hereby specifically acknowledges that The Trump Organization, Trump Marks LLC, Donald Trump, and any affiliates of the foregoing (collectively, "Trump") are not a party to this Agreement, and Bruni hereby agrees that it shall not name or seek damages from Trump in any dispute arising out of this agreement or out of the license agreement.

VETRERIE BRUNI S.p.A.

Dated: 6 / 12 , 2008

By: _____
     Gino Del Bon
     Chief Executive Officer

DRINKS AMERICAS, INC.

Dated: _____ , 2008
6/2/0 ⸴

By: _____
     Patrick Kenny
     President and CEO

-7-



**EXHIBIT A**

*FIG. 1*

FIG. 2





FIG. 5

*FIG. 3*





*FIG. 6*



FIG. 4

